**Greenbaum, Rowe, Smith & Davis LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for the Debtor
David L. Bruck, Esq.
(DLB/1957)

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | **Chapter 11 Proceeding** |
| KARA HOMES, INC., | **Case No. 06-19626 (MBK)** |
| Debtor. | |

### APPLICATION IN SUPPORT OF
### DEBTOR'S FIRST DAY MOTIONS

DAVID L. BRUCK, of full age, certifies and says as follows:

1.    I am an attorney at law of the State of New Jersey and a member of the firm of Greenbaum, Rowe, Smith & Davis, LLP, counsel to Kara Homes, Inc., the Debtor in the within matter (the "Debtor"). I make the within Certification in support of the entry of Orders as follows:

### BACKGROUND

2.    On October 5, 2006 (the "Filing Date"), the Debtor filed a Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.

3.    On October 9 and 10, 2006, twenty-one affiliates of the Debtor filed Chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey. A schedule of the petitions of the Affiliates (the "Affiliate Petitions") filing said Chapter 11 petitions is annexed hereto as Exhibit "A."

852823.02

4.      No trustee has been appointed and the Debtor remains in possession of its assets.

5.      No Official Committee of Unsecured Creditors has yet been appointed.

6.      The Debtor is a major home builder in the State of New Jersey. During the year 2005, the Debtor sold and delivered approximately homes and, in 2006 through August 30, 2006, the Debtor sold and delivered approximately 330 homes with gross sales revenues in excess of $300 million. The Debtor has twenty-one (21) active construction projects throughout the State of New Jersey, as well as other projects which have been completed and sold in the ordinary course. The Debtor has a backlog of approximately three hundred (300) contracts for the purchase of its homes, aggregating revenues in excess of $215 million. The contracts are between the Affiliates and homebuyers, and they are scheduled and valued in the petitions filed by the Affiliates. As set forth in the Debtor's petition, the Debtor owns ninety (90%) percent of each of the Affiliates, and values its interest in the Affiliates' properties as being in excess of $350 million. The Debtor has guaranteed institutional construction debt of approximately $230 million and has vendor and other unliquidated debt of approximately $50 million. The construction mortgage debt is secured in the Affiliates' cases by the underlying real estate and homes under construction.

7.      The Debtor and the Affiliates filed for Chapter 11 as a result of slowing sales, loss of liquidity and delays in the field which further delayed closings. The Debtor seeks to reorganize, fund its operation and complete those homes under contract with

2

the use of DIP financing and cash collateral from its existing lenders, analyze which projects, if any, should be sold and otherwise file a Plan of Reorganization.

8.    A number of the Debtor's projects are approved for sale by the Department of Community Affairs (the "DCA").    These particular projects are condominium, multi-family projects in which offering literature is approved by the DCA and then given to prospective homebuyers.  At the present time, the offering literature is being amended to reflect the fact that the Debtor and its affiliates have sought Chapter 11 protection so as to advise prospective homeowners of the same.

9.    As the Court might suspect, homebuyers under contract, title companies and purchase money mortgage lenders are concerned about the Debtor's ability to close titles and deliver deeds during the Chapter 11 proceeding.  The Debtor seeks, as part of its first day motions, an Order authorizing the continued operation of the Debtor in the ordinary course in order to give "comfort" to the title companies, mortgage lenders and purchasers of the Debtor's ability to continue to operate.  Such Order will, if approved, confirm the Debtor's ability to deliver title, continue to sell (subject to DCA approval with respect to the registered projects).  In addition, the Debtor seeks emergent first day Orders authorizing joint administration, payment of key employees including a stay-in-place bonus, extending the period to file Schedules, and approving the DIP financing arrangement with Medical Capital Corporation.

10.    The Debtor is in the process of negotiating with its institutional lenders in order to obtain project by project DIP financing of continued construction and use of cash collateral, with the proviso that any and all monies generated from sales will

3

852823.02

remain with the Affiliate subject only to a payment of a percentage to the Debtor by way of management fee in order to cover ongoing administrative expenses.

11.    Prior to filing the Chapter 11 proceeding and continuing, Kara Homes provided managerial services to its Affiliates. The Affiliates have no administrative staff, nor counsel, nor accountants. All of these services were provided by Kara Homes. The Debtor proposes that each Affiliate bear its proportionate share of the monthly operating cost of Kara Homes based upon the historical percentage of 4% of all costs associates with the construction of a home.  Further detail will be provided in a subsequent motion to be filed for approval of DIP financing with the Debtor's existing institutional lenders, and the use of cash collateral of the Affiliates.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this motion pursuant to 28 U.S.C. §157 at 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is properly before this Court pursuant to 28 U.S.C. §§1408 and 1409. The predicate for the relief requested herein is, in part, Sections 507, 364, 328, 330 and 105 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, and 9014.

## JOINT ADMINISTRATION

13.    The Certification of David L. Bruck annexed hereto as Exhibit "B" sets forth the organization of the Debtor and the Affiliates and the fact that the Debtor provided administrative services to each of the Affiliates and will continue to do so during these proceedings.  As a matter of practice, the Affiliates own the various construction projects and are borrowers on land acquisition/improvement and

4

construction loans advanced by institutional lenders.  Upon the sale of homes, the gross proceeds of the sale are used to repay the land acquisition/improvement and construction lender and are then swept into the bank account of Kara Homes, Inc. for payment of overhead and administrative expense.   It is premature to determine whether in fact the Debtor and the Affiliates should be substantively consolidated; however, at the Court's direction, Debtor's counsel will prepare an analysis of the inter-company transactions between the parties and provide it to the Court within thirty days of the date hereof.

14. Joint administration of the Debtor and the Affiliate cases will ease the administrative burden and facilitate a more economic and efficient approach to the administration of the case.

## PAYMENT OF PRE-PETITION PAYROLL AND BENEFITS TO KEY EMPLOYEES

15. Attached to this Application as Exhibit "C" is the Certification of Patrick Turner, general counsel to the Debtor.  Also attached, as exhibit "D" is a proposal to fund outstanding pre-petition payroll and a bonus of one additional week's pay to key employees.  As noted, prior to the week of the filing of the petitions, the Debtor operated with in excess of two hundred employees.  On the Tuesday evening before the filing, the Debtor terminated the employment of approximately 110 employees leaving approximately 70 employees on staff.  A list of the remaining employees together with their role in the operation of the Debtor is set forth as an Exhibit to the Turner Certification.

5

16.    There is no question concerning the fact that the employees will not remain with the Debtor without being paid.  Absent an Order authorizing the payment of these wage claims, the employees of the Debtor will leave their employment with the Debtor and seek employment with other companies.  Losing its human resources will force the Debtor to close its doors.  The key employees remaining with the Debtor are essential to its continued operation.  Except to a de minimis extent, the pre-petition wages owed to the key employees do not exceed the priority given to employees pursuant to 11 U.S.C. §507(a)(4).  Moreover, bankruptcy courts have authorized payment of prepetition wages and employee benefits owing in the ordinary course of the debtor's business.  See e.g. In re Colad Group, Inc. 324 B.R. 208, 214 (Bankr. W.D.N.Y. 2005).  Likewise, the courts have authorized debtors to make payments necessary to implement key employee retention and incentive programs.  Id.

17.    If the Court so directs, the Debtor will limit the payment of pre-petition wages and stay-in-place bonuses to only such amount which shall be equal to or less than the $10,000 priority given to employees under the Bankruptcy Code.

18.    At the present time, the Debtor does not have sufficient cash on hand to pay the pre-petition wage to its key employees nor the stay-in-place bonus; however, filed simultaneously herewith is an application to approve DIP financing with Medical Capital Corporation.  As noted in the Emergency Budget, a component is the payment of the pre-petition wages owed to remaining key employees.  Without this payment, the Debtor will not have sufficient human resources to continue in business.

6

## APPROVAL OF DIP FINANCING ARRANGEMENT
## WITH MEDICAL CAPITAL CORPORATION

19.     The Debtor seeks the approval, on an interim basis, of a DIP financing arrangement with Medical Capital Corporation in the aggregate amount of $5 million. The proposed loan agreement is attached hereto as Exhibit "E."

20.     Prior to and following the filing of the Chapter 11 petition by the Debtor and its Affiliates, the Debtor and Marc Sullivan, as its financial consultant, dealt with several prospective lenders, such as Blackacre, Spectrum, Columbus Nova, DIT Financial Group, Capital Sources, Apollo Capital Group and GSO Capital Group, as well as existing construction lenders in an effort to obtain funding for the Debtor's operation. Although there were a number of such potential lenders who expressed interest, Medical Capital Group is the only one which has focused on the Debtor's needs and has been responsive to the Debtor's urgency.  The Debtor has been unable to obtain a commitment for funding in the amount of $5 million on any basis other than as set forth in the Medical Capital Corporation transaction.  Certification of Marc Sullivan is attached hereto as Exhibit "F."

21.     Medical Capital Corporation is not related to the Debtor, or to any principal of the Debtor.  The transaction with Medical Capital Group has been negotiated at arms length and in good faith.

22.     Medical Capital Corporation has requested, as a condition of the transaction, that it be granted a super priority claim pursuant to 11 U.S.C. §364(c)(1) and a lien upon unencumbered assets of the Debtor.  The only assets which the Debtor owns which are unencumbered is its equity interest in the various Affiliates.  The Debtor

7

has proposed, and Medical Capital Corporation has agreed, to accept a first lien upon the interests of the Debtor in certain of the Affiliates as collateral for its funding with the understanding that Medical Capital Corporation shall nevertheless be paid from the net proceeds of closings, after the payment of all institutional land loan, improvement and construction financing.   For example, assuming that a house was sold for the contract price of $500,000 and the land and improvement lender was owed $140,000 and the construction lender was owed $260,000; those payments would be made. From the remaining $100,000, $35,000 would be paid to Medical Capital Corporation in reduction of its debt, and $65,000 would be available to the Debtor for use in the project owned by the Affiliate.    The only funds that would be allocated for administrative and overhead expenses of Kara, would be a percentage which has historically been used to cover administrative overhead.  In this case, four (4%) percent of the total cost of the house being sold, approximately $12,000.

23.    Attached to the Certification of Marc Sullivan is an Exhibit setting forth the source and use of proceeds of the $5 million DIP financing.  As noted, on an emergent basis, the Debtor seeks to draw $1,447,000 for emergent needs and the balance to be available subject to a hearing on final approval of the DIP loan.

24.    The Code authorizes a debtor to obtain credit and incur debt with some special priority if the trustee is unable to obtain unsecured credit under subsection (a) or (b) of Section 364. See 11 U.S.C. §364(c).  The proposed lender can obtain priority over any administrative expenses and one of the following: (1) a lien on unencumbered property of the estate; or (2) a junior lien on encumbered property.

8

25.    In the instant matter, under the terms of the proposed financing arrangement ("the Agreement"), the Debtor will grant the proposed lender, Medical Capital Corporation, its membership interest in Kara at Cottage Gate, LLC and Kara at Winding Run, LLC, which amounts to 90% of the net value of each of the companies (the "Collateral").    Since the Debtor's membership interest has not been pledged or otherwise encumbered, this application is made under subsection (2) of the §364(c). As a result, the security interest to be granted herein will not in any manner interfere with the existing security interest of the institutional construction and land lenders.

26.    In order to obtain the court's authorization for post-petition credit pursuant to §364(c) the Debtor has the burden of establishing that: (1) they were unable to obtain unsecured credit; (2) the proposed credit transaction was necessary to preserve assets of the estate; and (3) the terms of the proposed credit agreement are fair, reasonable, and adequate in light of the circumstances of the debtor and the proposed lender. See In re Carouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987).

### A.    The Debtor Made Exhaustive Efforts to Obtain Unsecured Credit

27.    In considering whether to approve the Debtors' Offer, the Court must first examine the Debtor's efforts to obtain financing on an unsecured basis. See In re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr.S.D.N.Y.1990).  While a debtor is not required to show that it sought credit from every possible source, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Code § 364(a) and (b). Id.

9

852823.02

28.    For example, the courts have found that, where the Debtor approached
only one lending institution and never attempted to obtain financing from its existing
lenders, other than on the proposed terms, the requisite showing of unsuccessful
efforts to obtain credit was not met.    See In re Carouse Group, Inc., 71 B.R. at 550.
Conversely, however, in In re Mid-State Raceway, Inc., the court found that the
debtor's efforts, which involved some negotiations and discussions with various financial
entities by the debtor's officers and well as its counsel, constituted reasonable efforts
under the circumstances.    323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005).

29.    In the instant matter, the Debtor and its financial consultant engaged in
extensive negotiations with many lenders.  Pre-filing, the Debtor and the consultant met
with each of the constitutional lenders without success.    A list of some of the lenders
with whom the Debtor met pre-petition is annexed to the Sullivan Certification.

## B.    The Approval of the Agreement will Facilitate Preservation of The Debtor's Assets

30.    The proposed financing must be necessary and must benefit the estate.
The rationale of this requirement is predicated upon the courts' recognition that lenders
often exact terms that "may or may not have the effect of causing harm to the estate
and its creditors."    In re Mid-States Raceway, Inc., 323 B.R. at 59; see also In re
Defender Department Stores, 145 B.R. 312, 317 (9th Cir. BAP 1992).    Indeed,
"bankruptcy courts do not allow terms in financing agreements [to] convert the
bankruptcy process from one designed to benefit all creditors to one designed for the
unwarranted benefit of the postpetition lender."    In re Defender Stores, 145 B.R. at
317.  In doing so, the courts' analysis must focus upon whether the terms of the

10

proposal prejudice the rights of creditors, or grant the lender excessive control. Id. Moreover, "a bankruptcy court cannot "approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." Id.

31.    Nonetheless, the court's discretion must be constrained to allow reasonable business judgment to be exercised. See In re Ames Department Stores, Inc., 115 B.R. at 40. To that end, debtors-in-possession must enjoy the right to "exercise their basic business judgment consistent with their fiduciary duties." Id. at 38. In determining whether the proposed financing arrangement is within the realm of sound business judgment, courts will typically examine all of the facts and circumstances to determine if the estate is being benefited. Id. at 39.    Critically, one of the main inquiries is "whether the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtor's business." In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D.Mo. 2003).

32.    In the instant matter, the "fresh" financing is necessary to preserve the present value of the Debtor's business.    Specifically, the funding is necessary because the housing projects, in which the Debtor has a 90% membership interest, are still under construction.  If they remain in their present state, the physical condition of the houses in question will significantly deteriorate.  Further, the Debtor's employees have not been paid for three weeks.  Rent is unpaid; insurance premiums are unpaid; counsel's retainer is not funded; and other emergent matters exist.  Lack of new financing would seriously jeopardize not only Debtor's but also the existing lenders'

11

position, because the Debtor will be unable to operate and the present value of the unfinished projects will rapidly decline over the winter.

33.    Perhaps more importantly, the Debtor has entered into approximately 300 contracts for the sale of homes which require work.    If completed, the proceeds of the sales of those homes will ensure the influx of monies for the benefit of the Debtor and its creditors, and will allow the Debtor to reorganize.  Conversely, if the Debtor defaults on its contracts, or if those are rescinded for the Debtor's failure to perform, its ability to generate those monies will be seriously compromised in light of the declining housing market.    There is no question that the value of a contract entered into one year ago has value.

34.    Based upon the above facts, it is clear that the proposed financing is not only necessary, but essential for the successful reorganization of the Debtor. Consequently, the proposed agreement is beneficial for the estate as well as for its creditors.

## C.    The Terms of the Proposed Credit Agreement are Fair, Reasonable and Adequate

35.    This requirement is closely connected to the one discussed above. Indeed, the analysis of the terms of the financing arrangement is guided by the same concerns, i.e., whether the terms of the proposed agreement will benefit all parties in interest and will not circumvent pertinent procedures and requirements of the Bankruptcy Code.

36.    Some of the terms which have been rejected by courts include those that leverage the Chapter 11 process (In re Ames Department Stores, Inc. 115 B.R. at 37);

12

cross-collateralization provisions (In re Monarch Circuit Indust. Inc., 41 B.R. 859, 861 (Bankrup. E.D.Pa. 1984); arrangements that benefit only the creditor/lender rather than estate (In re Crouse), or agreements between the debtor and its parent-lender where the parent completely dominates the debtor (In re St. Mary Hospital, 86 B.R. 393, 551 (Bankr. E.D.Pa. 1988)). None of these provisions exist here.

37.    Where none of the offending terms were found, the courts have authorized credit agreements made within the debtor's reasonable business judgment. See e.g., In re Ames Department Stores, Inc. 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990). Indeed, Section 364 was enacted in recognition of the difficulties that a company in reorganization may encounter in obtaining credit. See e.g. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.") In other words, it provides a way for a bankrupt company to continue operating under the supervision of the bankruptcy court. Indeed, a bankrupt debtor's continued operation is often beneficial to creditors who would otherwise not obtain payment in full.

38.    In this case, the Agreement negotiated with Medical is a result of good faith and arm's length negotiations. The agreement contains no terms that run contrary to the Chapter 11 proceedings, or which adversely affect rights of the secured creditors. Indeed, the relevant facts here abundantly demonstrate that if funding requested herein is permitted, the Debtor will be in position to keep its remaining

13

organization intact, move forward with completion of its contracts and remain viable in this proceeding.

39.    Finally, with respect to the terms of the Agreement, which provides for the Lender to receive interest at the rate of 18% per annum, the courts have "regularly authorized postpetition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364." In re Defender Drug Stores, Inc., 145 B.R. at 317.   The payment of interest is authorized "as compensation" for the use of the lender's money and the risk of nonpayment. Id.  While eighteen (18%) percent is high, it is a response to the credit risk and is not unfair.

40.    For all of the above reasons, it is respectfully submitted that the Debtor has met all of the §364(c) requirements, and it is requested that the Loan Agreement between the Debtor and Medical be approved.

## COMFORT ORDER

41.    As set forth in the narrative preceding this Section, the Debtor is involved in the business of construction development and sale of residential homes in the State of New Jersey.  Purchase of a home, in many instances, is the largest investment that people make; and for that reason, it is often approached with much caution, as it should be.  The insolvency of a developer of residential homes casts an aura of distrust upon the developer, and removal of that perception is critical to the Debtor's ability to reorganize.

42.    The Debtor has a number of projects which are registered with the Department of Community Affairs as previously noted.  Sales of the homes in those

14

852823 .02

projects cannot continue, nor can deposits be taken without approval of an amended Offering Statement.  For that reason, there will be a delay in the continued sale of these units; however, with respect to the non-DCA projects, there is no impediment to continued sales and to closings of the units.  The Debtor has a number of units which are complete and on which homeowners are anxious to close.  It is for this reason and because the funding of these closings will assist the Debtor in its operation and in reducing its construction loan debt that the Debtor seeks a "Comfort Order" to enable it to advise purchasers, lenders and title companies of its ability to continue closings and sales as approved by the Bankruptcy Court.  A copy of a proposed form of "Comfort Order" is annexed to this application.

## RESCINDED CONTRACTS

43.    Annexed hereto as Exhibit "G" is a list of contracts between the Debtor, the Debtor's Affiliates and homebuyers which have been rescinded by the homebuyers prior to the filing of the Chapter 11 proceeding and within the terms of the Contract. $1,782,373.80 in purchasers' deposits are the subject of these rescissions.

44.    Pursuant to the provisions of the contracts with homebuyers, the deposits were released to be used by the Debtor in the course of construction.  While some deposits remain in trust accounts, others do not.  The $1,782,373.80 of deposits are not in trust accounts.

45.    As noted above, it is essential that the Debtor be able to resurrect the public's trust in its abilities to develop homes and perform in accordance with its contracts.  Return of properly rescinded purchase deposits is critical.  In addition, failure

15

to return the deposits may result in the suspension of the builder's registration certificate granted to Kara Homes. Without the builder's registration, the Debtor cannot continue in business.

46.     The Debtor recognizes that the return of the deposits in these cases is a return of a pre-petition obligation; however, the Debtor believes that by doing so, the Debtor will be able to continue in business, will obtain the continued trust and loyalty of its homebuyers, and will otherwise have complied with applicable laws. For this reason, the Debtor seeks the Court's approval as part of the use of the DIP financing to be provided by Medical Capital Group to use $1,782,313.80 of those monies to refund these deposits.

47.     Finally, the filing of the within Chapter 11 petition and the petitions of the Affiliates involves review of a voluminous amount of documents. The Debtor seeks an extension of the time periods for filing schedules and statements of financial affairs for a period of thirty (30) days to November 15, 2006.

48.     For the foregoing reasons, the Debtor requests that the Court grant the relief as requested.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
David L. Bruck

**Dated:  October 13, 2006**

16

# EXHIBIT "A"

Kara Homes, Inc.

Related Bankruptcy Filings

| Entity Name | Case No. | Fed Tax ID # |
|---|---|---|
| Kara Homes, Inc. | 06-19626 | 22-3411496 |
| Bergen Mills Estates, LLC | 06-19758 | 56-2374177 |
| Country Club Estates by Kara, LLC | 06-19744 | 65-1208107 |
| Estates at Galloway Woods, LLC | 06-19746 | 20-2370112 |
| Hartley Estates by Kara, LLC | 06-19759 | 20-2308379 |
| Horizons at Birch Hill  LLC | 06-19767 | 55-0836523 |
| Horizons at Woodlake Greens, LLC | 06-19745 | 20-0587354 |
| Horizons at Woods Landing, LLC | 06-19760 | 65-1208104 |
| Kara at Buckley Estates, LLC | 06-19742 | 20-1235155 |
| Kara at Crine West, LLC | 06-19770 | 20-0545728 |
| Kara at Dayna Court, LLC | 06-19743 | 20-2609447 |
| Kara at Glen Eyre, LLC | 06-19765 | 20-2474410 |
| Kara at Hawkins Ridge, LLC | 06-19757 | 20-1231508 |
| Kara at Lacey, LLC | 06-19738 | 20-1460392 |
| Kara at Mt. Arlington I, LLC | 06-19780 | 52-2384637 |
| Kara at Mt. Arlington II, LLC | 06-19782 | 52-2384644 |
| Kara at Navasink, LLC | 06-19737 | 20-0545837 |
| Kara at Park Ridge Estates, LLC | 06-19783 | 55-0891774 |
| Kara at The Tradewinds, LLC | 06-19741 | 56-2368403 |
| Sterling Acres at Monroe, LLC | 06-19774 | 56-2374176 |
| The Landings at Manahawkin, LLC | 06-19740 | 56-2417012 |
| Winding Run Estates by Kara, LLC | 06-19764 | 20-0544961 |

# EXHIBIT "B"

**Greenbaum, Rowe, Smith & Davis LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for the Debtor
David L. Bruck, Esq.
(DLB/1957)

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | **Chapter 11 Proceeding** |
| KARA HOMES, INC., | **Case No. 06-19626 (MBK)** |
| Debtor. | |

**CERTIFICATION OF DAVID L. BRUCK
IN SUPPORT OF MOTION FOR JOINT ADMINISTRATION**

**DAVID L. BRUCK,** of full age, certifies and says as follows:

1.     I am an attorney at law of the State of New Jersey and a partner with the law firm of Greenbaum, Rowe, Smith and Davis LLP.  Kara Homes, Inc. ("Kara") filed a chapter 11 petition on October 5, 2006.  My application for this Court's authorization to be retained as counsel in connection with Kara's petition for Chapter 11 bankruptcy was filed on October 5, 2006 and is currently pending.

2.     Kara remains as a Debtor-in-Possession.   No Committee of Unsecured Creditors has yet been appointed.

3.     On October 9 and 10, 2006, twenty-one (21) separate Chapter 11 petitions were filed by my firm for entities affiliated with and owned by Kara, namely: (1) Bergen Mills Estates, LLC; (2) Country Club Estates by Kara, LLC; (3) Estates at

Galloway Woods, LLC; (4) Hartley Estates by Kara, LLC; (5) Horizons at Birch Hill, LLC; (6) Horizons at Woodlake Greens, LLC; (7) Horizons at Woods Landing, LLC; (8) Kara at Buckley Estates, LLC;  (9) Kara at Crine West, LLC; (10) Kara at Dayna Court, LLC; (11) Kara at Gley Eyre, LLC; (12) Kara at Hawkins Ridge, LLC; (13) Kara at Lacey, LLC, a/k/a Hidden Lakes; (14) Kara at Mt. Arlington I, LLC, a/k/a Horizons at Mt. Arlington; (15) Kara at Mt. Arlington II, LLC, a/k/a Horizons at Pennington; (16) Kara at Navasink, LLC, a/k/a Cottage Gate; (17) Kara at Park Ridge Estates, LLC; (18) Kara at the Tradewinds, LLC; (19) Sterling Acres at Monroe, LLC;  (20) The Landings at Manhawkin, LLC; and (21) Winding Run Estates by Kara, LLC  (the "Affiliates").

4.      Kara is a major New Jersey-based company engaged in residential homebuilding.    Kara builds throughout the State of New Jersey and currently has at least twenty-one (21) active projects.

5.      The Affiliates were formed in furtherance of Kara's policy to have an independent entity as the owner of each separate project, and all are organized as limited liability companies.

6.      Kara owns ninety (90%) percent of each Affiliate, with Mr. Zudi Karagjozi owning the remaining ten (10%) percent interest.   As a result, Kara and its affiliates (collectively referred to as the "Debtors"), have a uniform ownership and management structure.

7.      Each of the aforesaid Debtors is organized pursuant to the laws of the State of New Jersey.   Each affiliate owns and operates a separate residential project.

2

850844.01

The Affiliates are administered by Kara and share in the expense of the administrative overhead.

8.      In addition, each of the Debtors is involved in the field of real estate development, and Kara works with each Affiliate in connection with work performed on the various projects. Kara provides administration, supervision and overhead for each of the Affiliates. Included within such administrative assistance is accounting, human resources, design services, warranty work, administrative staff, in-house legal starring, etc., insurance, etc.

9.      Each of the Affiliates is a borrower with one or more of fourteen (14) construction lenders. Kara has executed guarantees of each construction loan.

10.     The books and records of each Affiliate were maintained separately although all revenues were swept from the Affiliate accounts into Kara accounts; and, while it is premature to seek entry of an Order approving the substantive consolidation of the Debtors, it would be cost effective, avoid unnecessary duplication, and ease the administration of the within cases if joint administration were effectuated immediately.

11.     The books and records of Kara and the affiliates reflect certain inter-company transactions. It is premature to determine whether such inter-company transactions create conflicts so as to preclude joint administration. All funds were swept from the Affiliates into Kara accounts, so if there is a debt from any company to the other, it is between Kara and the Affiliates, not between Affiliates. Such inter-company transactions should not preclude the efficacy of joint administration.

3

12.     I make the within Certification to set forth my knowledge of the internal workings of the above companies, and in support of the within motion to obtain an Order for joint administration of these Chapter 11 cases.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
David L. Bruck

**Dated:  October  9, 2006**

4

850844 . 01

# EXHIBIT "C"

**Kara Homes, Inc.**
**Post Petition Budget**
**Payroll**

**Administration**

| | | |
|---|---|---|
| Grabowski, Suzanne | | 80,000 |
| Goldstein, Janet | | 30,160 |
| | 2 | 110,160 |

**Accounting/Finance**

| | | |
|---|---|---|
| Casiero, John | | 125,000 |
| Figurelli, John | | 85,000 |
| Peshkopia, Judy | | 75,000 |
| Pulaskie, Janice | | 55,000 |
| Madigan, Christine | | 44,520 |
| Peters, Janice | | 60,000 |
| Trelhart, Barbara | | 41,600 |
| | 7 | 486,120 |

**Purchasing**

| | | |
|---|---|---|
| Fallon, Jerold | | 155,000 |
| Duff, Dan | | 75,000 |
| Suozzo, William | | 85,000 |
| Pinho, Alex | | 100,000 |
| | 4 | 415,000 |

**Architecture**

| | | |
|---|---|---|
| Mijali, Nabil | 1 | 85,000 |

**Legal**

| | | |
|---|---|---|
| Turner, Patrick | | 175,000 |
| Iammatteo, Sandra | | 125,000 |
| Giglio, Laura | | 62,000 |
| Carroll, Denise | | 83,000 |
| Bohling, Margaret | | 41,995 |
| | 5 | 486,995 |

**Human Resources**

| | | |
|---|---|---|
| Pompeo, Melissa | | 55,000 |
| Schultz, Roberta | | 100,000 |
| | 2 | 155,000 |

**Information Technology**

| | | |
|---|---|---|
| McPaul, James | | 67,000 |
| Barnebie, James | | 35,000 |
| | 2 | 102,000 |

**Bonds/Transitions/Land Devel/Approvals**

| | | |
|---|---|---|
| Werner, Mary | | 175,000 |
| Santowasso, Brett | | 65,000 |
| Peshkopla, Shannon | | 65,000 |
| Chester, Paul | | 70,000 |
| Lewkowicz, Julian | | 80,000 |
| Helfrich, Harry | | 65,000 |
| | 6 | 520,000 |

**Construction**
**North**

| | | |
|---|---:|---:|
| Perotti, Rob | | 125,000 |
| Piselli, Carmine | | 50,000 |
| Louro, Jean | | 80,000 |
| Parvesse, Nick | | 72,000 |

**South**

| | | |
|---|---:|---:|
| Bergman, Stafford | | 90,000 |
| Epstein, Mitch | | 64,800 |
| Beaty, Tom | | 74,800 |

**Central**

| | | |
|---|---:|---:|
| Maconi, Phil | | 85,000 |
| Maconi, Frank | | 85,000 |
| Woisznies, Jim | | 77,600 |
| Kelly, Kevin | | 78,600 |
| Sumchik, John | | 39,520 |
| Barrett, Claire | | 40,000 |
| | 13 | 962,320 |

**Sales Administration**

| | | |
|---|---:|---:|
| Resto, Robert | | 47,600 |
| Russell, Tracy | | 72,000 |
| | 2 | 119,600 |

**Warranty**

| | | |
|---|---:|---:|
| Lodato, Kathy | | 66,000 |
| Payton, Melissa | | 35,000 |
| Smith, Larry | | 49,920 |
| Wolter, Eric | | 55,600 |
| Swatowski, Marian | | 42,519 |
| Delgado, Julio | | 42,519 |
| Gramm, Paul | | 51,719 |
| Healey, Vincent | | 51,719 |
| Jones, Steven | | 51,719 |
| Kahley, Jason | | 57,800 |
| Donaldson, Raymond | | 38,840 |
| Giaretta, Rob | | 58,599 |
| | 12 | 601,954 |

**Executive**

| | | |
|---|---:|---:|
| Karagjozi, Zuhdi | | 100,000 |
| Peshkopia, Hektor | | 100,000 |
| Kelly, John | | 120,000 |
| Gough, Tom | | 160,000 |
| Brandt, George | | 100,000 |
| | 5 | 580,000 |
| | 61 | 4,624,149 |

**Sales and Design Studio**

| | | |
|---|---|---|
| Karagjozi, Rose | | 36,000 |
| Clambrone, Susan | | 35,000 |
| Demerau, Karen | | 35,000 |
| Hinck, Penny | | 41,995 |
| | | |
| Schmidt, Lynn | | 10,400 |
| Jablonski, Tom | | 100,000 |
| Larkin, Keith | | 40,000 |
| Jablonski, George | | 40,000 |
| Jablonski, Pam | | 40,000 |
| Sansone, Susan | | 40,000 |
| Camilleri, Greg | | 40,000 |
| Fitzpatrick, Joe | | 40,000 |
| Duerkes, Lisa | | 40,000 |
| | 13 | 538,395 |
| | | |
| Annually | 74 | 5,162,544 |
| | | |
| Monthly | | 430,212 |

# EXHIBIT "D"

## KARA HOMES, INC.
### First 30 day Budget

|  | Month 1 |
|---|---|
| Payroll | $430,212 |
| Payroll taxes @ 8.4% | $37,702 |
| Benefits @ 15% | $67,326 |
| Insurance | $220,000 |
| Rents - occupancy | $32,000 |
| Rents - equipment | $36,000 |
| Rents - model homes | $0 |
| Utilities | $50,000 |
| Security | $35,000 |
| Telephone | $10,000 |
| Cell Phones | $2,500 |
| Real estate taxes[1] | $0 |
| Supplies | $10,000 |
| Repairs | $0 |
| Pre-Title | $0 |
| Tools & Equipment | $0 |
| Portable Toilets | $10,000 |
| Advertising | $0 |
| Postage | $500 |
| Overnight deliveries | $2,500 |
| Internet Fees | $0 |
| Computer Supplies | $0 |
| Office Supplies | $2,000 |
| Cleaning | $0 |
| Payroll Service | $2,000 |
| Contingency | $50,000 |
|  |  |
| TOTAL: | $1,197,740 |

[1] Does not include real estate taxes due November 1, 2006

# EXHIBIT "E"

October 11, 2006

Kara Homes, Inc.
c/o David Bruck, Esq.
Greenbaum, Rowe, Smith & Davis LLP
99 Wood Avenue South
Iselin, NJ 08830

Dear Mr. Bruck:

Please allow this to act as a formal statement of the terms of the contemplated Debtor In Possession Loan provided by Medical Capital Corporation, or one of its affiliates ("Lender"), to Kara Homes, Inc. ("Borrower"). This term sheet shall not create a binding obligation on Lender. None of these terms should be considered final or binding until the final loan documents have been executed by both parties and approved by the relevant Bankruptcy court.

Amount:       The principal amount of the loan shall be Five Million Dollars ($5,000,000.00)

Term:       The term of this loan shall be for six (6) months. Borrower may exercise an option to renew the Term for an additional six (6) months if Borrower does not default on any provision of the loan agreement.

Interest:       The interest rate is Eighteen Percent (18%) per annum.

Repayment:    Interest only payments shall be made quarterly in arrears with a balloon payment at the end of the Term inclusive of all outstanding principal, fees and interest. As properties from the attached schedule are closed, the greater of $35,000.00 or Forty Percent (40%) of net proceeds of each property shall be paid to the Lender to pay down outstanding principal.

Origination Fee:       There shall be an origination fee charged to the Borrower equal to two percent (2%) of the available principal due and owing at the Closing.

Fees:  Borrower shall also pay to Lender all of its attorneys fees and all recording fees.

Collateral:      Borrower shall make available as Collateral for this loan all of its net proceeds
from the properties in the attached schedule.  Borrower shall also pledge as collateral all of its
interest in Kara at Cottage Gate, LLC and Kara at Winding Run, LLC   Further, Borrower will
ensure that Lender will have an Administrative Superpriority on all of the Collateral.

It is the intent of the parties to enter into a subsequent Debtor In Possession Loan for a larger
amount and longer Term at a later date.  Should the parties enter into this later loan this current
loan contemplated by this document will be refinanced by the later loan.

Medical Capital Corporation

_____

Joseph J. Lampariello, President

# EXHIBIT "F"

**Greenbaum, Rowe, Smith & Davis LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for the Debtor
David L. Bruck, Esq.
(DLB/1957)

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | **Chapter 11 Proceeding** |
| KARA HOMES, INC., | **Case No. 06-19626 (MBK)** |
| Debtor. | |

## CERTIFICATION OF MARC SULLIVAN IN SUPPORT OF
## THE DEBTOR'S APPLICATION FOR INTERIM DIP FINANCING

MARK SULLIVAN, of full age, certifies and says as follows:

1.    I am the principal at Sullivan & Co. (the "Company"), a financial consulting company.

2.    This Certification is made in support of Kara Homes, Inc.'s (the "Debtor" or "Company") application to obtain interim DIP financing filed pursuant to Section §364(c) of the Bankruptcy Code.

3.    I have been working as a financial consultant with the Debtor prior to its filing of the Chapter 11 Petition (the "Petition"), and I continue to provide various financial services to the Debtor on a daily basis.

4.    A Motion to approve my retention as a financial consultant to the Debtor's counsel is submitted herewith as part of the First Day Motions.

852747.01

5. I am fully familiar with the Debtor's financial condition and the circumstances surrounding its filing of the Chapter 11 Bankruptcy Petition on October 5, 2006 (the "Petition").

6. Prior to the filing of the Petition, I have attempted, on behalf of the Debtor, to obtain funding from a variety of lenders.

7. Specifically, I have had discussions with the following potential lenders: Medical Capital Corporation, Blackacre, Spectrum, Columbus Nova, DIT Financial Group, Capital Sources, Apollo Capital Group and GSO Capital Group.

8. Of all of the potential lenders which I contacted, only Medical Capital Corporation ("Medical" or the "Lender") focused on the Debtor's needs, and particularly, on the urgency of the Debtor's financial needs.  While other lenders expressed an interest, no one else was prepared to commit on the terms agreed to by Medical.

9. The proposed "Loan Agreement" negotiated with the Lender is a product of arm's length and good faith negotiations between Joseph J. Lampariello, President of Medical Capital Corporation, myself and David L. Bruck, counsel to the Debtor.  A copy of the Term Sheet is attached hereto as Exhibit "A."

10. The main terms of the Loan Agreement are as follows:

    (a) The Lender agreed to loan to the Debtor the principal amount of Five Million Dollars ($5,000,000.00);

    (b) The term of the loan shall be for six months (6) months, renewal at Debtor's option provided that the loan is then in good standing;

    (c) Interest shall accrue at the rate of eighteen percent (18%) and will be payable quarterly, in arrears;

2

852747.01

  (d)  Principal shall  be paid from closings at the rate of the greater of $35,000 or forty (40%) percent of net proceeds remaining after payment of normal closing adjustments and repayment of contractual release prices to contractor and land improvement lenders;

  (e)  The Lender's interest is to be secured by the Debtor's pledge as security of its interest in Kara at Cottage Gate, LLC and Kara at Winding Run, LLC ("Collateral"). The security interest so pledged is in an asset which is free from any other encumbrances.  The Debtor believes that the asset value of its equity in the two LLCs is approximately $15.5 million based upon a valuation of the asset value of the two LLCs less institutional mortgage debt;

  (f)  The Lender will have an administrative super-priority claim;

  (g)  The Debtor will pay an origination fee equal to two percent (2%) of the available principal due and owing at Closing.

11.  I believe that the terms of the Agreement stated above, are both fair and reasonable under the circumstances, i.e., considering the Debtor's filing of the Chapter 11 petition; its urgent need to obtain financing to continue its operations; and its inability to obtain financing from any other lender.

12.  Importantly, the Agreement in no way affects the rights and interest of the secured creditors.

13.  The financing to be provided by Medical Capital Corporation is urgently needed to fund certain emergencies including payroll to remaining key employees; medical insurance premiums,; an additional retainer to counsel; rent; security and the return of deposit monies to home owners who properly rescinded their contracts.

14.  The financing is also necessary to avoid deterioration of the condition, and the attendant decline in value, of the unfinished houses, should they be left in their present state over the winter.

3

852747.01

15.    The Debtor, as a general matter, nets approximately $100,000 per closing after the payment of construction and land acquisition mortgages, normal closing adjustments and commissions.  Under the financing arrangement, $35,000 to $40,000 would be used to repay Medical Capital Corporation.  At that rate, it will take approximately 120 to 125 closings to repay the principal amount of the loan.  The Debtor has 300 homes under contract and intends with funding from its construction lenders to continue building.  The Debtor is negotiating with its lenders, but needs the infusion of this $5 million to keep its organization in place.

16.    As a result, the proposed financing agreement is in the best interest of the estate.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Marc Sullivan

**Dated:  October 13, 2006**

4

852747.01

KARA HOMES
**Short Term Capital Requirements**
Source and Use of Funds
10-Oct-06

## _USE OF FUNDS_

| | | |
|---|---|---|
| Key Employees Pre Petition Salaries, Commissions and Payroll Taxes | | $ 510,000 |
| Insurance | | |
| General Liability/D&O | $420,000 | |
| Health Insurance (October) | $142,000 | |
| | | $ 562,000 |

Project Security
    1.5 guards per project
    $18/hour X 12 hrs/day
    30 days X 18 projects +auto expense        $ 175,000
    Note:  Each project constructin lender will be
    requested to fund reimbursement of security
    costs under the "preserve and protect"
    provisions of their respective loan agreements

Middletown Twp (cash bond to enable Cottage Gate closings)    $ 200,000

**Emergency Funding Required**    **$1,447,000**

Legal Fees (Additional Retainer)    $   150,000
30 Day Budget Funding Requirements (Schedule)    $1,197,740
Allocation for Homeowner Deposit Refunds    $1,783,000
Other Professional Fees    $    50,000

**TOTAL USE OF FUNDS**    **$4,627,740**

## _SOURCE OF FUNDS_

Projected Closings, Net Cash Proceeds (Schedule)    $   707,138

Medical Capital Corporation
DIP Commitment, net of closing    $4,855,000

**Total Source of Funds**    **$5,562,138**

**Available for Operations**    **$   934,398**

# EXHIBIT "G"

| Terminated Contracts 2006 | | Revised 10/3/06 | |
|---|---|---|---|
| | | | |
| Job # | Community | Buyer | Deposit |
| 020023 | Birch Hill | Kopelev | 42,875.00 |
| 020032 | Birch Hill | Ying | 50,235.00 |
| 010006 | Birch Hill | Umbria | - |
| 260220 | Birch Hill | Esposito | 20,000.00 |
| 110117 | Birch Hill | Balanos | - |
| 020035 | Birch Hill | Levine | 48,203.00 |
| 020019 | Birch Hill | Davis | 27,990.00 |
| 5 | Buckley Estates | Mamum | 108,897.50 |
| 1 | Cottage Gate | Wu | 96,290.00 |
| 35 | Cottage Gate | Haspilaire | 122,469.00 |
| 54 | Cottage Gate | Simmons/Tuminelli | 71,490.00 |
| 14 | Country Club Estates | Hague | 84,090.00 |
| 090083 | Landings | Squitieri | 55,784.50 |
| 090088 | Landings | Katz | 45,733.00 |
| 090085 | Landings | Escher | 50,882.00 |
| 140122 | Landings | Kaye | 78,863.00 |
| 160153 | Landings | Maresca | 51,405.50 |
| 160150 | Landings | Panayoti | 44,071.00 |
| 140128 | Landings | Freeman ? Which Job? | 46,735.50 |
| 170159 | Landings | Tomey | 71,472.50 |
| 070064 | Landings | Meisenberg/Field | 49,338.00 |
| 090081 | Landings | Sikorski | 53,284.50 |
| 160148 | Landings | Caputa | 32,228.00 |
| 010002 | Limerick | Mariami | 22,658.05 |
| 19 | Orchard Meadows | Behar | 122,985.00 |
| 2 | Park Meadow | Prabhudesai | 146,801.25 |
| 59 | Winding Run | McGee | 51,343.00 |
| 123 | Winding Run | Devonish | 87,023.00 |
| 3 | Woodlake Green | Voltolino | 12,500.00 |
| 53 | Woodlake Green | Scimeme | 54,261.50 |
| 37 | Woods Landing | Besas | 11,340.00 |
| 201 | Woods Landing | Romeo | 10,000 00 |
| 122 | Woods Landing | Wisneski | 11,065.00 |
| | | | 1,782,313.80 |