**NOT FOR PUBLICATION**
UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
----------------------------------------------------------X

In Re:                                                                          Chapter 11

KARA HOMES, INC.,                                                Case No.: 06-19626 (MBK)


                                      Debtor.
----------------------------------------------------------X

APPEARANCES:

Kenneth Baum, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602
Attorney for Bernard A. Katz, Liquidating Trustee

Mariah Murphy, Esq.
Ballard Spahr, LLP
Plaza 1000 – Suite 500
Main Street
Voorhes, NJ 08043
Attorney for Lehman Commercial Paper, Inc.


**MICHAEL B. KAPLAN, U.S.B.J.**


**MEMORANDUM DECISION**

**I.    INTRODUCTION**

This matter is before the Court by way of a Motion for an Order Expunging Claims ("Motion") filed on behalf of the Liquidating Trustee ("Trustee"). Through the Motion, the Trustee seeks an Order reducing the claim of Lehman Commercial Paper, Inc. ("Lehman") against Kara Homes, Inc. ("Debtor") by the full amount of Lehman's credit bid for Debtor's

asset; resulting in an unsecured deficiency claim in the amount of $2,953,802.41.[1] Lehman opposes the Trustee's Motion and submits that Lehman's claim should not be reduced by the full amount of the credit bid, but rather that a valuation hearing is necessary to establish the deficiency. The Court entertained oral argument on the Motion on November 19, 2012. The parties were asked to submit additional documentation relevant to the underlying sale. For the reasons set forth below, the Trustee's Motion is GRANTED in part.

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The following constitutes the Court's finding of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[2]

## II.    FACTS/PROCEDURAL HISTORY

Kara Homes, Inc. and numerous other related and affiliated entities ("Debtors") filed separate petitions for relief under Chapter 11 of the United States Bankruptcy Code. Lehman is a creditor of the Debtors by reason of its claim against one of the Debtors, Glen Eyre, LLC ("Glen Eyre"), as the successor in interest to National City Bank. Lehman filed a timely proof of claim in the amount of $16,165,255.75 evidencing the Debtors' indebtedness to Lehman pursuant to loan documents executed by Glen Eyre and guaranteed by Kara Homes. Pre-petition,

---

[1] The Trustee's initial moving papers request that Lehman's claim be expunged in its entirety in light of the fact that the claim was satisfied by sale proceeds and is a non-recourse claim against the Reorganized Debtors. *Trustee's Motion to Expunge*, Docket Entry No. 4703-2, *10. The Trustee has changed his position and currently requests an Order setting the remaining unsecured deficiency claim at $2,953,802.41. *See Trustee's Reply Memorandum*, Docket Entry No. 5463, *4.

[2] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Glen Eyre was divided into development projects to be completed in two phases known as Glen Eyre I and Glen Eyre II. The Debtors sold Glen Eyre I to a third party purchaser and used the proceeds of the sale to make partial payment to Lehman. Lehman then credit bid a portion of its secured debt in the amount of $8 million at the Debtors' auction of Glen Eyre II pursuant to 11 U.S.C. §363(b). Lehman acknowledges that its claim against the Debtors should be reduced by the sale proceeds received from the sale of Glen Eyre I in the amount of $5,211,453.34. However, the parties disagree as to the amount of the resulting unsecured deficiency claim owing to Lehman as a result of Lehman's purchase of Glen Eyre II by its $8 million credit bid.

The Trustee submits that Lehman's claim should be reduced by the $8 million credit bid, leaving an unsecured deficiency claim in the amount of $2,953,802.41. Lehman contends that the amount which it bid at auction is not determinative of the value of the project for purposes of establishing a deficiency claim. Lehman requests a fair market valuation hearing to determine the amount of the remaining deficiency. For the reasons set forth below, the Trustee's Motion is GRANTED in part and Lehman's request for a valuation hearing is DENIED.

### III.    VALUATION OF THE PROPERTY TO ESTABLISH DEFICIENCY CLAIM

Lehman relies on the Supreme Court's holding in *BFP v. Resolution Trust* in support of its argument that the purchase price obtained at public auction or a foreclosure sale is not the equivalent of the fair market value of a property. 511 U.S. 351, 358, 114 S.Ct. 1757, 128 L.Ed. 2d 556 (1994). Lehman also reminds the Court that it relied on *BFP* when making its determination in *In re Denaro,* 383 B.R. 879 (Bankr. D.N.J. 2008). As Lehman correctly notes, this Court ruled in *Denaro* that a credit bid at auction is not *necessarily* determinative of actual value for purposes of establishing a proof of claim. *Lehman's Supplemental Objection to*

3

*Trustee's Motion*, Docket Entry No. 5462, *4 (emphasis added).  This Court held that "in employing its equitable powers to grant a fair value credit, the Court may take into account the circumstances of the sale, *e.g.*, the existence of fraud and/or collusion, as well as the adherence to state law rules and procedures." *Denaro*, 383 B.R. at 886.  Ultimately this Court ruled that perhaps the most significant factor to consider is whether there has been competitive bidding at the sale. *Id.*  It is undisputed that Glen Eyre II was purchased lawfully with Lehman's $8 million credit bid at the sale conducted by the Debtors pursuant to 11 U.S.C. §363(b).  Given the analysis in *Denaro*, the Court now must look to the circumstances of the sale in this case to determine the value of the underlying collateral for purposes of fixing the amount of any deficiency.

During the hearing on the Motion held on November 19, 2012, the Court requested additional submissions from the parties; specifically, the Court requested documentation and information relevant to the underlying §363 sale.  However, no supplemental information has been produced to date.  In addition, neither counsel for the Trustee nor counsel for Lehman is personally familiar with the circumstances of the sale and it remains unknown whether there were multiple bids or competing offers.  Therefore, the Court must make its determination as to the competitiveness of the sale and the reasonable equivalence of the collateral's value based on the few known facts and rational inferences.

As the Trustee points out, the notion of holding a deficiency hearing following a foreclosure sale is designed, in part, to preclude a windfall under general equitable principles. *See Resolution Trust Corp. v. Berman Industries, Inc.*, 271 N.J. Super. 56 (App. Div. 1993); *Citibank, N.A. v.* Errico, 251 N.J. Super. 236 (App. Div. 1991); *Borden v. Cadles of Grassy Meadows II, LLC*, 412 N.J. Super. 567 (App. Div. 2010).  Although we are presented with a sale

4

by means of auction in the case at bar, the same general equitable principles are applicable. Here, the existence of a windfall is possible only if it could be shown that Glen Eyre II was worth substantially more or substantially less than $8 million at the time of the auction. If the project was worth more than $8 million, then Lehman enjoys the windfall. Conversely, if the project was worth less, the Debtors benefit from the amount paid at auction. The Trustee does not submit that the value of Glen Eyre II was different than the $8 million credit bit. Oddly, neither does Lehman argue that $8 million did not accurately represent the value of Glen Eyre II. Rather, Lehman asserts simply that it is entitled to a valuation hearing to determine the value without proffering any evidence to suggest that the value differs from the amount of the credit bid.

Further, Lehman does not, and seemingly cannot, offer any explanation as to the purpose behind their $8 million bid. A common sense approach suggests that Lehman purchased the property at that price because it believed Glen Eyre II's value to be equal to, or greater than, $8 million. As counsel for the Trustee pointed out during the November 19th hearing, Lehman is a sophisticated business entity. If Lehman truly believed that the value of Glen Eyre II was less than $8 million at the time of the auction, it could have, and logically would have, let the property go to a junior bidder or credit bid in a lesser amount. Lehman has offered no evidence to suggest that the property was worth less than $8 million at the time of the auction and Lehman fails to provide a business justification for the amount of its credit bid.

Given the information before the Court, it appears that Lehman deliberately and thoughtfully chose to bid $8 million. As Lehman states in its objection to the Motion, Lehman's credit bid for Glen Eyre II was only a portion of its secured debt. *Lehman's Objection to Trustee's Motion*, Docket Entry No 4838, *3. Thus, Lehman was clearly aware that it had the

option of bidding an amount less than the full value of its secured debt. It logically follows, therefore, that Lehman's decision to bid $8 million was based on some rational justification; namely, that the value of Glen Eyre II was equal to, or greater than, that amount. As discussed earlier, Lehman offers no explanation or evidence to suggest otherwise. Bottom line, Lehman has not offered the Court any compelling rationale for why the amount of its credit bid exceeded the fair market value of Glen Eyre II at the time of the auction. In the absence of a business justification for the precise amount of the bid, the Court will accept the amount of a credit bid from a sophisticated business entity, which knowingly had the option to bid more or less, as evidence of the fair market value of the property.[3]

This Court bases the present decision, in part, upon its prior holding in *Denaro,* which recognizes that "'after the fact' judicial re-creation of a market sale, through appraisal testimony and analysis, is not warranted where the circumstances of the sale reveal adherence to state law procedures and competitive third party bidding." *Denaro*, 383 B.R. at 887. The Court now expands upon that decision and holds that 'after the fact' judicial re-recreation of a market sale is not warranted where the Court reasonably can infer from the circumstances of the sale that the amount of a credit bid by the secured party reflects the bidder's informed assessment of the collateral's fair market value.

---

[3] The Trustee submits that it would be inequitable to hold a valuation hearing now, more than five years after the auction of Glen Eyre II, because Lehman could potentially benefit from changes in the real estate market. The Court notes that the significant time lapse is due in no part to a fault or failure on behalf of Lehman. As stated above, Lehman timely filed its claim. The Debtors and the Trustee received several extensions to their deadline to object to claims, which resulted in a significant gap between the date of the auction and the date that the value of the remaining deficiency claim became a disputed issue. It would be inequitable for this Court to allow the Trustee to rely upon a time lapse, for which he shares responsibility, in support of his argument against a valuation hearing. However, the Court finds that this significant time difference has little bearing on the Court's decision. The Court's analysis, and ultimate ruling, would remain the same even if Lehman sought a valuation hearing a mere week following the auction.

## IV. CONCLUSION

Based upon the information before the Court, there is nothing to suggest that the amount of the credit bid differs from the actual value of Glen Eyre II at the time of the auction. In the absence of a business justification for bidding a value greater than the value of the property, the Court will not compel a valuation hearing. Accordingly, the Court denies Lehman's request for a valuation hearing and grants the Trustee's Motion in part. The value of the remaining deficiency claim is hereby set at $2,953,802.41. Counsel for the Trustee is directed to submit an Order consistent with this Memorandum Opinion.

Dated: December 11, 2012

_____
Honorable Michael B. Kaplan
United States Bankruptcy Judge