**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
U.S. COURTHOUSE
402 E. STATE STREET
TRENTON, NEW JERSEY 08608

| | |
|---|---|
| Hon. Michael B. Kaplan<br>United States Bankruptcy Judge | 609-858-9360<br>609-989-2259 Fax |

January 19, 2016

Jeffrey S. Posta, Esq.
Stark & Stark, PC
P.O. Box 5314
Princeton, NJ 08543-5315
*Attorney for Madison Crossing at Birch Hill Condominium Association, Inc.*

Donald F. Campbell, Jr., Esq.
Giordano, Halleran & Ciesla, PC
125 Half Mile Road
Suite 300
Red Bank, NJ 07701
*Attorney for Madison Crossing at Birch Hill, LLC*

        **Re:**    **In re Kara Homes, Inc.**
               **Case No.: 06-19626**

Counsel:

      This matter is before the Court by way of (i) Madison Crossing at Birch Hill Condominium Association, Inc.'s (the "Association" or "Movant") Motion for a Determination That Claims Are Not Barred By Discharge, Injunction, Release Or Orders Entered In The Bankruptcy Case, And For Any Related Relief, and (ii) Madison Crossing at Birch Hill, LLC's ("Madison") Cross Motion To Enforce Sale Order And For Sanctions. The Court has reviewed the pleadings submitted and entertained oral argument on November 2, 2015 and December 10, 2015. The Court issues the following ruling:

**I.**    **Jurisdiction**

      The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as

amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (L), (N) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## II.     Background

On October 10, 2006 ("Petition Date"), Horizons at Birch Hill, LLC ("Birch Hill" or the "Debtor") filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (the "Code"). The Court entered an order directing the joint administration of the Debtor's case with that of its parent company, Kara Homes, Inc. ("Kara"), which also filed a Chapter 11 bankruptcy petition on October 5, 2006. The Debtor remained in possession of its assets and continued management of its business as a debtor-in-possession.

The sole asset of Birch Hill was a tract of land located in the Townships of Old Bridge, Marlboro, New Jersey (the "Property"). The Property consists of approximately fifty-five (55) acres and 228 planned condominiums. On the Petition Date, 74 units were sold and closed, 45 units were under contract, and 109 units remained unsold. Further, there were no completed amenities for the 60-70 families residing in the complex. The clubhouse was approximately forty percent (40%) complete, and like many of the uncompleted units on the Property, it was not secured and had been subjected to partial vandalism. Weeds ran throughout the construction area, where some trailers and construction vehicles had been abandoned. The entrances to the complex, including the roadwork and curbing, were also incomplete.

The Association was one of the Debtor's largest unsecured creditors. Prior to the Petition Date, the Association's board members (the "Board") consisted of one unit owner, Frank Ramson, and two representatives of the Debtor. On February 7, 2007, the law firm of McGovern Legal Services, LLC filed a notice of appearance on behalf of the Association, indicating that the

Association had retained legal counsel. On February 14, 2007, the Association filed a proof of claim ("Proof of Claim") for an undetermined sum of money. That Proof of Claim was amended to the amount of $2,415,856.00 by the Association on October 20, 2007. On February 21, 2007, the Debtor turned over temporary control of the Board to two additional owner representatives who occupied the developer seats on an impermanent basis.

At various times throughout the bankruptcy proceeding, the Association participated through its counsel. On April 12, 2007, Kara filed a Master Plan and Disclosure Statement, which was subsequently modified on multiple occasions. On May 15, 2007, the Association filed an objection to Kara's Master Disclosure Statement, alleging that the Disclosure Statement failed to disclose the existence of causes of actions and their potential value, did not contain a liquidation analysis, and failed to set forth the feasibility of the plan with specificity.

On June 1, 2007, the Debtor entered into a Global Settlement Agreement ("Global Agreement") with Amboy National Bank ("Amboy"), the sole secured creditor in the case, regarding a number of properties owned by Kara, including the Property owned by the Debtor, subject to the Court's approval. On June 12, 2007, the Association filed a limited objection to the Debtor's motion to approve the Global Agreement, objecting to the altering of the Association's rights under the Master Deed and the Public Offering Statement. The Bankruptcy Court entered an order approving the Global Agreement over the objection of the Association on June 14, 2007.

On August 9, 2007, the Association filed a limited objection to the Debtor's motion for entry of an order approving the auction sale of the Property. The Association did not object to the Bankruptcy Code Section 363 sale ("Sale") of the Property, but did object to the extent the motion attempted to alter or amend the rights of the Association pursuant to the Public Offering

Statement filed with the State of New Jersey or the Association's Master Deed. On August 20, 2007, the Bankruptcy Court entered an order approving procedures related to the Sale of the Property; however, the order was revised to recognize that the Sale would not modify the Master Deed. On September 24, 2007, the Bankruptcy Court entered an order authorizing the Debtor to sell the Property to Amboy or its assignee. The Bankruptcy Court approved the Plan and Disclosure Statement on September 27, 2007, and then issued a final decree closing the Debtor's case on October 15, 2008.

Upon the Court's approval of the Plan and Disclosure Statement, the Debtor transferred the unsold units and lands of the Property to Amboy's designee, Madison. Madison then continued the construction and development of the Property. On January 31, 2008, Madison replaced the two unit owners, who were temporarily appointed to the Board when the Debtor filed for bankruptcy protection, with their own representatives. The Board thereafter remained in Madison's control until June 2013 when 75% of the units at Madison were sold. The unit owners then exercised their right to elect a majority of members on the Board in accordance with the Planned Real Estate Development Full Disclosure Act (the "2013 Transition").

After the 2013 Transition, the Association hired professionals to undertake preliminary investigations of the exterior cladding and roofing systems, among other building components comprising the common areas of Madison. The Association alleges that these investigations resulted in its awareness, for the first time, of various deficiencies in the design and construction of buildings on the Property. Further, the Association alleges that these design defects and construction deficiencies have caused, and will continue to cause, consequential damage to the effected buildings, affecting the habitability of Madison and the unit owners' ability to enjoy the use of their units and common areas.

As a result of these discovered defects, the Association engaged Stark & Stark, P.C. as special counsel to commence a state court action against the original and successor sponsor/developers, the Debtor and Madison, respectively. The Association's state court complaint was filed on April 21, 2014; however, because Madison was constructing and continues to construct and/or sell units on the Property, it negotiated a tolling agreement with the Association to dismiss claims against the successor developer/sponsor, without prejudice, for a period of 24 months. The Association then moved before the Bankruptcy Court for the relief discussed in this opinion, to which Madison has filed opposition.

### III.   Discussion

#### A.   Accrual of Claims – Legal Framework

As a preliminary matter, the Court notes that the timing in which the within case was confirmed and closed dictates an examination of the legal standard as to the definition of a "claim" under the Bankruptcy Code; specifically, the Court reviews the Third Circuit's framework for interpreting claims under *Avellino v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332 (3d Cir.1984) ("*Frenville*"); *JELD-WEN, Inc. v. Van Brunt (In re Grossman's)*, 607 F.3d 114 (3d Cir. 2010) ("*Grossman*"); and *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. Pa. 2012) ("*Wright*"), as these decisions apply in this case.

Notwithstanding the Bankruptcy Code's typically expansive interpretation of the definition of a claim, the *Frenville* court interpreted the term narrowly. In doing so, the Third Circuit focused on the "right to payment" language in the definition and concluded that a right to payment does not exist until there is a cause of action under applicable state law. This interpretation created the "*Frenville* accrual test," which provides that a valid claim exists under the Bankruptcy Code at the time the claimant's right to payment arises under state law.

5

The *Frenville* approach was ultimately rejected by the Third Circuit in *Grossman* due to its conflict with the Code's broad definition of what constitutes a claim. Rather, the test for when a claim accrues provided in *Grossman* necessitates that a claimant be exposed to a debtor's product or conduct pre-petition, as well as requiring that individuals recognize that, by being exposed to a debtor's product or conduct, they might hold claims even if no damage is then evident. In effect, *Grossman* expanded *Frenville's* definition of what constitutes a claim.

In *Wright*, the court was faced with a claimant who was exposed to a defective product post-petition, but pre-confirmation. While the Third Circuit had not dealt with this issue before, it had previously noted in *Grossman* that the Eleventh Circuit had extended their accrual test to include pre-confirmation exposure. The Eleventh Circuit reasoned that shifting the focus to the confirmation date would provide for a rule more consistent with the Bankruptcy Code and its broad definition of the term "claim." *In re Piper*, 58 F.3d 136 (3d Cir. 2010). The Third Circuit in *Wright* joined in this reasoning, stating that failing to extend the test to pre-confirmation exposure would be at odds with the Code's expansive treatment of the term "claim" which they had recognized in *Grossman*.

*Wright* then discussed the issue of whether the plaintiff's claims were discharged. A lack of adequate notice "precludes discharge of a claim in bankruptcy," due to the absence of due notice. *Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995). Notice is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality…" *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); s*ee also* 11 U.S.C. Section 342(a) ("There shall be given such notice as is appropriate… of an order for relief… under the [Bankruptcy Code]." Whether adequate notice has been provided depends on the circumstances of a particular case. *Grossman*, 607 F.3d at 127. Further, due process requires that

6

"notice [be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the actions and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.

The discussion of whether the plaintiffs were provided with due process in *Wright* stemmed from the claimants finding themselves in a unique situation. At the time the plaintiffs received notice of the bankruptcy proceeding, *Frenville* was still the relevant law in the Third Circuit, and under the accrual test the plaintiffs did not hold claims. Notwithstanding, when *Frenville* was overturned and the new test was established for determining when a claim exists under the Code, the plaintiffs held unanticipated claims that could potentially be discharged under the proceedings. While the bar date had already passed and the Confirmation Order had been entered, the court stated that "due process affords a re-do in these special situations to be sure all claimants have equal rights." *Wright*, 679 F.3d at 108. Thus, the court held that "for persons who have 'claims' under the Bankruptcy Code based solely on the retroactive effect of the rule announced in *Grossman*, those claims are not discharged when the notice given to those persons was with the understanding that they did not hold claims." *Id*. at 109. The Third Circuit in *Wright* saw the need for a limited exception to the *Grossman* test: due process necessitates that the *Frenville* "accrual" test will still apply to pre-confirmation claims in cases where reorganization plans were confirmed prior to the *Wright* decision.

Like the plaintiff's in *Wright*, Movant in the current action falls within this unique group discussed by the Third Circuit. Kara's plan was confirmed in August of 2009, before both *Grossman* was decided in 2010 and *Wright* in 2012. As a result, Movant was not afforded the requisite due process and *Frenville* guides the Court in determining whether Movant's claims

7

survive the Sale and Confirmation. As the *Frenville* accrual test requires, this Court's analysis shifts to applicable state law.

      **B.**      **Applicable New Jersey State Law**

          **(i)**      **The Discovery Rule**

As previously discussed, the *Frenville* accrual test requires a court to determine when the claimant's right to payment arises under state law. In New Jersey, a "cause of action accrues when any wrongful act or omission resulting in any injury… for which the law provides a remedy occurs." *Beauchamp v. Amedio*, 164 N.J. 111 (2000). Additionally, New Jersey has adopted the common law doctrine known as the "discovery rule" for the tolling of a cause of action in order to avoid unfair and unreasonably harsh outcomes. *Villalobos v. Fava*, 342 N.J.Super. 38 (App. Div. 2001). The discovery rule provides that a cause of action's accrual is tolled and the statute of limitations does not begin to run until the injured party discovers, learns, or reasonably should learn, the existence of facts which may equate in law with an actionable claim. *Burd v. N.J. Tele. Co.*, 76 N.J. 284 (1978).

In *Grunwald v. Bronkesh*, 131 N.J. 483 (1992), the New Jersey Supreme Court held that the purpose of the discovery rule is to postpone the accrual of a cause of action when a plaintiff is not aware, and could not be aware, of the necessary facts to constitute an actionable claim. When the discovery rule is applied, once a potential plaintiff has facts that would allow for the reasonable conclusion that the other party's unreasonable or negligent conduct may have caused or contributed to the cause of the injury, that potential plaintiff then has knowledge of the other party's fault. *Savage v. Old Bridge-Sayerville Medical Group*, 134 N.J. 241, 248 (1993). For the reasons expressed more fully below, the Court finds that the discovery rule applies in this case.

### (ii) Equitable Tolling and Statute of Limitations

While the Court is cognizant of the case law involving equitable tolling and the statute of limitations, these concepts speak more to when a lawsuit may be instituted than to when a claim accrues. While the discovery rule quantifies when a claim *accrues*, both equitable tolling and statutes of limitation govern when such claim must be *initiated* by way of a lawsuit. This distinction is particularly important in Bankruptcy Court, whereby the accrual date is relevant to whether a claim may be discharged or subject to a sale to a purchaser, free and clear of the claim.

With respect to statutes of limitation, which is limited to six years in this case pursuant to N.J.S.A. Section 2A:14-1, New Jersey courts have refused to allow a statute of limitations to run against an association that may have a claim against a developer while the developer controls the association's board, due to the association's lack of legal standing to assert claims prior to transition. *Siller v. Hartz*, 93 N.J. 370 (1983). As expressed in *Terrace Condominium v. Midlantic National Bank*, 268 N.J. Super. 488 (Law Div. 1993), equity cannot support the running of limitation periods against an association that lacks the legal capacity to assert its right while the developer controls the board of trustees.

Similarly, through the doctrine of "equitable tolling", New Jersey courts have provided protection to plaintiffs who may require their cause of action tolled to avoid an unjust result. *Wanner v. Philip Carey Mfg. Co.*, 243 N.J. Super. 516 (App. Div. 1989). "Equitable tolling assumes the accrual of the action but intercepts and delays the bar of the statute of limitations because the plaintiff lacked vital information which was withheld by the defendant." *Villalobos*, 342 N.J.Super at 45. In discussing the discovery rule vis-à-vis equitable tolling and statutes of limitation, "[t]he Third Circuit has elaborated on these provisions, determining that the discovery rule 'postpone[s] the beginning of the statutory limitations period from the date when the alleged

injury occurred, to the date when the plaintiff actually discovered he or she had been injured,' while, 'equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed.'" *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386-1387 (3d Cir. 1994).

As noted above, equitable tolling and statutes of limitation provide parameters on when a claim may be brought, while it is the discovery rule that dictates when a plaintiff's claim accrues. As such, it is the discovery rule that is applicable to this case. Indeed, the Association's claim could not have accrued until one or more of the Board members knew of the alleged construction defects. The relevant inquiry, therefore, is whether any of the Board members were aware of the construction defects prior to confirmation, rather than whether equitable tolling had halted the statute of limitations when the injury occurred.

### (iii)     Knowledge of the Association's Board Members

In applying the discovery rule, the Court must determine whether any of the Association's Board members knew or should have known about the construction defects prior to confirmation. Given the upheaval associated with the Chapter 11 filing, including the changes with respect to control of the Debtor, as well as the composition of the Board, the Court does not find that the Association should have known of the construction defects relative to the common areas. Indeed, the Association could not have been expected to expend its limited resources to hire professional engineers and contractors at a time when it was unclear whether there would even be a successful exit from bankruptcy.

It is undisputed that the Debtor turned over temporary control of the Board to the unit owners on February 21, 2007, four months into the Bankruptcy. From that date until Madison purchased the Property and reestablished majority control over the Board by appointing its own

10

representatives, the Association participated in the proceedings through its hired counsel. Madison argues that this participation, evidenced by the Association's amended Proof of Claim and various objections, along with the entered Sale Order, precludes the Association from now bringing its claim for construction defects.  The Association contends that the temporarily held control of the Board should not impact the unit owners' right to bring their claims, because they lacked the ability to discover such defects until the 2013 Transition and, therefore, accrual could only have occurred post-confirmation.

Evidence as to the knowledge of the Association's Board members regarding the construction defects prior to confirmation remains lacking. The Proof of Claim filed by the Association was nonspecific and precautionary. At this juncture, the Court cannot determine whether any Board member, particularly Mr. Ramson who was a board member during most, if not all, of the relevant pre-confirmation time period, discovered any of the construction defects prior to confirmation. On this record, the Court does not believe it has sufficient information to make such a determination, as there is currently a lack of specificity regarding these defects.[1]

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

---

[1] Even if discovery sufficiently demonstrates knowledge by one or more of the Association's Board members of the construction defects prior to confirmation, it may become necessary for the Association to demonstrate that such knowledge is imputed to all members of the Board. However, the Court cannot make that determination until the record is more fully developed as to what, if any, knowledge the Board members had.

**IV.     Conclusion**

In light of the foregoing, the Court is affording the parties the opportunity to take additional limited discovery, for ninety days, in order to ascertain if any of the Association Board members had sufficient knowledge of the construction defects prior to confirmation. Without this information, it is impossible for the Court to conclude when the Association's claim accrued and whether the Association is precluded from pursuing such claim. The Court will enter an appropriate scheduling order.

Dated: January 19, 2016

Honorable Michael B. Kaplan
United States Bankruptcy Judge